UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

BERNICE YU,

                    Plaintiff,

                                     **MEMORANDUM & ORDER**

        -against-                        12-CV-00813 (PKC)


MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                    Defendant.

---------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Plaintiff Bernice Yu ("Yu") commences this action under 42 U.S.C. § 405(g)[1]

challenging the decision of Defendant Commissioner of Social Security (the "Commissioner"),

denying Yu's application for Social Security disability insurance benefits.[2]   (Dkt. No. 1

("Compl.").)   Yu moves for judgment on the pleadings, reversing the Commissioner's decision

and remanding for a new hearing and decision; the Commissioner cross-moves for judgment on

the pleadings, affirming his decision.   Fed. R. Civ. P. 12(c); (Dkt. Nos. 10-14).   For the reasons

set forth below, this Court GRANTS Yu's motion and DENIES the Commissioner's cross-

motion.

---

[1]     "R. __" refers to the administrative record, which largely consists of the record
considered by Administrative Law Judge Gitel Reich ("ALJ").  (Dkt. No. 15.)

[2]     The June 14, 2011 decision of the ALJ (R. 10-21) became the Commissioner's *final*
decision denying Yu's application.  (R. 1.)

I.    Background

Yu was an attorney with 17 years of experience and a law degree from Fordham.  (R. 43, 424.)  A series of events—a back injury in February 2004, reinjury to her back in early 2005, and subsequent health issues—triggered and sustained Yu's disability, which kept her out of work. (Compl. ¶ 4; R. 33, 38, 208.)

Before Yu became disabled, she earned a six-figure salary working in-house at an international conglomerate of advertising and marketing agencies, including McCann Erickson. (R. 32, 135.)   In this position, Yu advised clients, drafted contracts, conducted negotiations, supervised lawsuits and government investigations, and dealt with outside law firms.  (R. 136.) This position required Yu to stand for approximately six hours and sit for approximately six hours each day and to frequently lift or carry files weighing ten pounds or more.  (*Id.*)  Yu held this position until February 2002, when she was terminated.  (R. 32-33.)  After her termination, in around 2003, Yu tried but failed to find other positions as an in-house attorney.[3]  (R. 45.)

Yu was 45 years old in February 2004, when her disability started.  (R. 119, 131.)  Yu continued to satisfy the Social Security Act's insured status requirement until December 2008, when she was 50 years old.[4]  (R. 126, 131.)

---

[3]     From May to August 2010, Yu did "seasonal" work for the Census Bureau, but the Commissioner does not dispute that such work failed to constitute "substantial gainful activity." (R. 15, 46.)

[4]     "When the person last met the insured status requirement before the date of adjudication, the oldest age to be considered is the person's age at the date last insured.  In these situations, the person's age at the time of decisionmaking is immaterial."  Social Security Ruling 83-10, 1983 WL 31251, at *8 (1983).

### A. Administrative Record

#### 1. Medical Evidence

##### i. Visual Impairments

On October 21, 2004, as requested by Yu's primary physician, Dr. Diana Santini (R. 223, 335), Dr. Leila Rafla-Demetrious saw Yu for an ophthalmology consultation, because Yu complained about "floaters" in her eyes. (R. 224, 238.) At this consultation, Dr. Rafla-Demetrious recited Yu's history of type II diabetes, hepatitis B, hypertension, and a cataract in the left eye,[5] and diagnosed Yu with hypertensive retinopathy[6] and potential glaucoma.[7] (R. 238-39.) Yu's vision was 20/60 in the right eye and 20/50 in the left eye. (*Id.*)

On January 4, 2005, Dr. Rafla-Demetrious prescribed Xalatan to treat Yu's potential glaucoma. (R. 235.) Three weeks later, Dr. Rafla-Demetrious found that Yu had exhibited a "good response" to Xalatan, but additionally diagnosed Yu with a cataract in the right eye. (R. 231.)

On March 22, 2005, Dr. Rafla-Demetrious newly diagnosed Yu with an after-cataract[8] in the left eye and open-angle glaucoma.[9] (R. 241-42.) Yu's vision was worse in both eyes

---

[5] Cataracts develop when proteins deteriorate in and cloud the lens of the eye. Cataracts in adults "develop slowly and painlessly," and most adults have cataracts by the time that they are the age of 75. PubMed Health, *Cataract* (2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001996.

[6] Hypertensive retinopathy is retinal damage that results from high blood pressure. PubMed Health, *High Blood Pressure & Eye Disease* (2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001994.

[7] Glaucoma is a condition where the build-up of pressure in the eye causes damage to the optic nerve. PubMed Health, *Glaucoma* (2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002587.

[8] After-cataracts, or posterior capsular opacification, involve clouding behind the lens that is implanted during cataract surgery. This condition can be corrected with a procedure known as YAG laser capsulotomy. Scott Greenstein, *What Is After-Cataract (Posterior Capsular*

(20/70). (R. 241.) On April 7, 2005, Dr. Rafla-Demetrious performed YAG laser capsulotomy to correct Yu's after-cataract in the left eye. (R. 244-45.) Approximately two months after the YAG laser capsulotomy, Yu's vision improved in the left eye (20/40), but deteriorated in the right eye (20/80). (R. 246.) Yu was also diagnosed with a "senile," or age-related, cataract in the right eye.[10] (R. 247.)

On October 17, 2006, Dr. Rafla-Demetrious also prescribed Lumigan to treat Yu's open-angle glaucoma, because the amount of pressure in her eyes was "poor." (R. 252.) One month later, Dr. Rafla-Demetrious found that Yu's eye pressure was "better . . . on Lumigan, though still a bit higher than optimal." (R. 256.)

On January 23, 2007, Dr. Rafla-Demetrious found that Yu's eye pressure was "poor . . . on Lumigan" and "higher than optimal," so prescribed Istalol instead. (R. 258.) Yu also complained about blurriness, and indeed her vision had deteriorated to 20/100 in the right eye and 20/80 in the left eye. (R. 257.) Two months after that, Dr. Rafla-Demetrious found that Yu's eye pressure was "still higher than optimal" on Istalol. (R. 261.) Yu's vision, however, had improved in both eyes: 20/50 in the right eye and 20/40 in the left eye. (R. 260.)

On June 5, 2007, Dr. Rafla-Demetrious also prescribed Azopt, in addition to the Istalol that Yu was already prescribed, as Yu's eye pressure was still too high. (R. 263.) A month later,

---

*Opacification), & Is There Anything That Can Be Done To Fix It?*, ABC News (Aug. 24, 2009), http://abcnews.go.com/Health/EyeHealthCataractTreatment/cataract-posterior-capsular-opacification-fix/story?id=8508467.

[9] Open-angle glaucoma is the "most common type of glaucoma" and, unlike angle-closure glaucoma, "painlessly and slowly damages vision." PubMed Health, *Glaucoma*, *supra*.

[10] "About 90% of all people who have cataracts have age-related cataracts (senile cataracts): here the lens of the eye gradually becomes cloudy as part of the aging process." PubMed Health, *Overview: Cataracts* (2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0057410.

Dr. Rafla-Demetrious took Yu off Azopt and prescribed Travatan Z as an alternative, because the combination of Azopt and Istalol had not lowered Yu's eye pressure. (R. 266.)

On December 13, 2007, Dr. Rafla-Demetrious suddenly discovered that Yu had a "good" amount of eye pressure. (R. 277.) Yu's vision was nearly the same: 20/60 in the right eye and 20/40 in the left eye. (R. 276.) Two months later, Dr. Rafla-Demetrious again found that Yu had a "fair/good" amount of eye pressure. (R. 285.) Yu's vision had improved slightly to 20/40 in the right eye and 20/25 in the left eye. (R. 284.) Further follow-ups led to similar findings. (*See* R. 287 (May 29, 2008), 290 & 292 (Aug. 26, 2008), 295-96 (Dec. 22, 2008), 301-302 (Feb. 3, 2009).)

On February 3, 2009, Yu discussed with Dr. Rafla-Demetrious and agreed to proceed with surgery for the cataract in Yu's right eye. (R. 300, 302.)

On February 23, 2009, during a pre-operative examination requested by Dr. Rafla-Demetrious, Dr. Santini noted that Yu was unable to read with the right eye which was blurry, but otherwise had no pain in that eye. (R. 380.)

On March 2, 2009, Dr. Rafla-Demetrious performed the surgery, which involved cataract extraction and lens implantation in the right eye. (R. 311.) Yu went home the same day as the surgery. (*Id.*) After the surgery, Dr. Rafla-Demetrious described Yu as either "doing well" or "doing great." (R. 323 (Mar. 3, 2009), 318 (Mar. 10, 2009), 326 (Apr. 7, 2009), 329 (May 19, 2009).) Her vision, a month after the surgery, was 20/20 in the right eye and 20/20 in the left eye. (R. 325.)

On May 19, 2009, Dr. Rafla-Demetrious's impression was that, with respect to Yu's open-angle glaucoma, the amount of pressure was "ok" in the right eye, but "borderline" in the left eye. (R. 329.)

ii.     Spinal Impairments

After Yu started feeling pain precipitated by the injury and reinjury to her back in 2004 and 2005, Dr. Santini referred Yu to an unnamed orthopedist.  (R. 158.)  This orthopedist ordered an MRI, which revealed a herniated disc in Yu's lumbar (lower back) spine[11] that was placing pressure on a nearby nerve.  (*Id.*)

On June 14, 2005, pain management specialist, Dr. Joel Kreitzer, began seeing Yu.  (*Id.*) Dr. Kreitzer noted at this time that, due to the herniated disc, Yu felt pain in her left buttock down to her ankle and cramping in her legs.[12]  (*Id.*)  Dr. Kreitzer found that Yu was unable to stand or sit for long periods of time without "considerable discomfort."  (*Id.*)  To treat Yu's pain, Dr. Kreitzer subsequently prescribed physical therapy and different drugs (Diclofenac, Quinine, Neurontin, and Tramadol) and administered epidural steroid injections.[13]  (*Id.*)  These treatments, however, were insufficient.  (*Id.*)

Thus, on April 21, 2006,[14] even though Dr. Kreitzer continued to treat Yu through June 26, 2006 (*id.*), another orthopedist, Dr. Andrew Casden, saw Yu for a consultation upon referral

---

[11]     Herniated discs refer to when discs between the bones in the spine shift out of place, which, if these discs impinge on spinal nerves, can lead to pain or numbness, typically only on one side.  The pain sometimes increases with standing or sitting.  After such treatments as surgery, long-term pain in the leg or back can persist.  PubMed Health, *Herniated Disk* (2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001478.

[12]     Herniated discs in the lumbar spine are the most common, and can affect the leg, hip, buttocks, or even the calf or foot.  *Id.*

[13]     Epidural steroid injections involve injecting anti-inflammatory medicine into the sac of fluid around the spine, which should decrease the pressure on nearby nerves and provide pain relief.  PubMed Health, *Epidural Injections for Back Pain* (2011), http://www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0010380.

[14]     A letter addressed to Dr. Santini (R. 190) suggests that Dr. Andrew Casden first saw Yu on April 21, *2005*, but this letter is incorrectly dated, as evidenced by the fact that (i) this letter refers to "an MRI from June 2005," which Yu brought with her (*id.*); (ii) an accompanying form

by Dr. Santini.[15]  (R. 190.)  Dr. Casden noted pain in Yu's left buttock and her leg down to her ankle.  (*Id.*)  Dr. Casden also noted that Yu's pain started at least a year ago and, although this pain once registered as a ten on a ten-point scale, it was now an eight.  (*Id.*)  Dr. Casden reviewed an MRI that Yu brought to this consultation—the one that the unnamed orthopedist previously ordered—and found that this MRI revealed a herniated disc *and* cyst in Yu's lumbar spine, which were causing her pain.  (*Id.*)  Noting that prior "conservative" treatments, including physical therapy, drugs, and epidural steroid injections, proved inadequate, Dr. Casden concluded that, "at this point after a year[,] it is reasonable to do surgery for [the herniated disc and cyst]," and ordered a new MRI before the surgery.[16]  (R. 190-91.)

On May 5, 2006, as ordered by Dr. Casden, an MRI of Yu's lumbar spine showed herniation, in that a disc was protruding and placing "moderate" pressure on a nearby nerve and the thecal sac.[17]  (R. 197-98.)  This MRI also showed mild bulging of two other discs in the lumbar spine.  (*Id.*)  Finally, this MRI showed straightening of the natural curve in the lumbar spine, which suggested that Yu was having spasms.  (R. 197.)

---

containing Dr. Casden's treatment notes is dated April 21, *2006* (R. 192); and (iii) an undated questionnaire completed by Dr. Casden confirms that 2006 is correct (R. 409).

[15]     Dr. Casden recited Yu's history of diabetes, hepatitis B, hypertension, cataracts, and glaucoma.  (R. 190, 192.)

[16]     During this consultation, however, Dr. Casden's physical examination of Yu showed that Yu's walking was "normal," her ability to flex and extend her lumbar spine was "reasonable," and the muscle strength and reflexes in her legs looked fine.  (R. 190.)

[17]     The thecal sac is a fluid-filled bag that contains the nerves along the spine.  Patient Education Institute, Inc., *Epidural Anesthesia* (2012), at 1, available at http://www.nlm.nih.gov/medlineplus/tutorials/epiduralanesthesia/htm/index.htm.

On May 11, 2006, Yu underwent surgery on her lumbar spine, performed by Dr. Casden: laminotomy[18] for the herniated disc and removal of the cyst. (R. 202.) Progress notes after the surgery indicated that Yu was "doing well," showed "functional mobility," and had some soreness in her back as expected, but no pain in her leg. (R. 203.) Yu was ready to return home on the same day. (*Id.*)

On May 22, 2006, during Yu's first post-operative follow-up, Dr. Casden's nurse practitioner noted that "[t]he pain [Yu] had before surgery is mostly resolved, although she does get occasional cramping." (R. 189.) At another follow-up a week after, Dr. Casden summarily stated that Yu "has had a nice result from surgery," and was "doing well and looks good." (R. 188.) At a July 11, 2006 follow-up, Dr. Casden briefly noted that Yu was "doing nicely" with "no significant problems" after the surgery. (R. 187.)

On March 13, 2007, Dr. Casden repeated that Yu was "doing nicely" after the surgery on her lumbar spine, but now noted that she sometimes suffered pain, which was "quite bad," in and around the thoracic (upper-and-middle-back) spine. (R. 186.) Accordingly, Dr. Casden ordered an MRI of Yu's thoracic spine. (*Id.*) This MRI, taken on March 21, 2007, revealed that, though Yu's thoracic spine seemed fine, her lower cervical (neck) spine had "extensive" osteophytes[19] near two discs and potentially "severe" foraminal stenosis[20] near one disc. (R. 193-94.)

---

[18]     Laminotomy, also known as diskectomy, is surgery to remove, entirely or in part, discs between the bones in the spine. Such surgery is done in hospitals with general anesthesia and involves making incisions in the back, shifting muscles and tissue to expose the spine, and removing materials from or fragments of the discs themselves. PubMed Health, *Diskectomy* (2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004511.

[19]     Osteophytes are abnormal, bony projections that appear atop the bones in the spine. Medline Plus, *Lumbar Spinal Surgery—Series* (2012), http://www.nlm.nih.gov/medlineplus/ency/presentations/100119_2.htm.

[20]     Foraminal stenosis occurs when the openings, from which nerves exit the spine, narrow. This condition can cause pain, numbness, or cramping, typically only on one side, which may

On March 30, 2007, Dr. Casden again repeated that Yu was "doing nicely" after the surgery. (R. 185.) In contrast to his last set of notes, however, Dr. Casden noted this time that Yu had "some minor aches and pains with complaints here and there but nothing really too bad." (*Id.*)

On September 2, 2008, Dr. Casden prepared a letter in support of Yu's claim before the Internal Revenue Service ("IRS") that Yu was disabled when she withdrew funds from her qualified retirement plan in 2006. (R. 70, 183.) Dr. Casden's letter stated that, specifically because of the surgery on Yu's lumbar spine and subsequent recovery, Yu had been "unable to work from approximately June 2005 to August 2007." (R. 183.) Dr. Santini, in a later letter, said the same thing, and referred the recipient to the "subspecialist[']s notes," presumably Dr. Casden's. (R. 367.)

On September 19, 2008, when Yu returned to Dr. Casden for the last time, Dr. Casden noted that Yu had pain "all over" which was difficult to pinpoint and, as such, recommended that she visit a rheumatologist. (R. 184, 409.)

On November 25, 2008, as recommended by Dr. Casden, a rheumatologist, Dr. Jessica Berman, saw Yu for a consultation. (R. 208.) As Dr. Berman noted, Yu reported tension in her neck, "sharp pain" in her torso from turning, some stiffness in her hands when performing specific tasks, occasional sciatica,[21] excessive cramping in her legs during the evening, and weakness in her ankles, which sometimes resulted in pain. (R. 208-209.) Dr. Berman herself examined Yu, and detected tenderness adjacent to Yu's cervical spine, with pain when she fully

worsen by standing. PubMed Health, *Spinal Stenosis* (2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001477.

[21] Sciatica is pain or numbness in the leg due to damage to the sciatic nerve, which starts in the lumbar spine. PubMed Health, *Sciatica* (2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001706.

extended and moved from side-to-side. (R. 211.) At the same time, Dr. Berman found that Yu had a full range of motion in her arms, hands, hips, and knees, and the ability to flex her back forward up to 90 degrees. (*Id.*) Dr. Berman's impression was degenerative joint disease[22] in Yu's spine, considering that Yu did not have stiffness in the morning and her back and neck pain worsened with activity. (R. 212.)

Upon referral by Dr. Santini (R. 359), Yu also began a series of physical therapy sessions. The therapist's notes from these sessions referenced the surgery on Yu's lumbar spine in 2006, and that her physician had determined that Yu suffered pain and weakness in her legs and feet. (*E.g.*, R. 337.) The therapist found that Yu "tolerated . . . well" her first two sessions in late January 2009. (R. 337, 339.) At the second session, the therapist even noted that Yu supposedly felt better. (R. 339.)

On February 23, 2009,[23] Dr. Santini, like Dr. Berman, examined Yu and similarly found that Yu's neck was "supple" and her arms, hands, legs, and feet had "normal" ranges of motion. (R. 381.) At the same time, Dr. Santini concluded that Yu continued to suffer back pain. (R. 383.) Dr. Santini again prescribed physical therapy, while suggesting that Yu still follow up with Dr. Casden.[24] (*Id.*)

---

[22]    Degenerative joint disease, or osteoarthritis, occurs when aging or "wear and tear" causes cartilage between the bones to deteriorate and the bones to rub together, which can result in pain, swelling, and stiffness. PubMed Health, *Osteoarthritis* (2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001460.

[23]    The record only contains Dr. Santini's notes from May 29, 2008 onward, even though she was Yu's primary physician well before that time. (R. 368-91; *see* Dkt. No. 11 ("Pl. Br."), at 5 n.23.)

[24]    Dr. Santini also noted that Yu's hepatitis B, hypertension, and glaucoma were "stable." (R. 382-83.)

At another physical therapy session on April 22, 2009, the therapist found that Yu had pain and weakness in her right knee, noting that she felt this pain when taking stairs and slightly when walking and that this pain registered as an eight on a ten-point scale. (R. 343.) At subsequent sessions, the therapist found that, in addition to Yu's right knee pain, Yu was generally growing tired with exercise and cramping easily. (R. 344-45, 347, 349, 351, 353, 355, 357.) The therapist's notes further indicated that, on May 4, 2009, Yu also reported neck pain and overall achiness (R. 347); on May 6, 2009, she claimed to have less knee pain (R. 349); on May 12, 2009, she complained about her neck and lower back (R. 353); on May 18, 2009, she had no further complaints, but still had pain which registered as a seven on a ten-point scale (R. 355, 363); and on May 20, 2009, she was seemingly "[v]ery tired and [fatigued] [sic]" (R. 357). On June 11, 2009, however, Yu was "discharged" from physical therapy due to improvements in her symptoms and reduced pain, which registered only as a one or two on a ten-point scale. (R. 365.)

In an undated questionnaire, Dr. Casden cited the fact that, from April 21, 2006 to September 19, 2008, he had examined Yu every four to six weeks. Dr. Casden indicated that, during these prior examinations, Yu (i) primarily exhibited pain and fatigue as her symptoms and (ii) demonstrated limited range of motion, tenderness, spasms, and swelling.[25] (R. 409-10.) Dr. Casden's opinion was that, over the course of a normal eight-hour work day, Yu would only be able to stand for three hours and sit for three hours at a time, and lift or carry objects up to ten pounds on occasion. (R. 411-12.) Dr. Casden also opined that Yu ought to avoid standing or sitting "continuously in a work setting." (R. 412.)

---

[25] Dr. Casden provided two diagnoses in this questionnaire, which are illegible. (R. 409.)

iii.     Gastrointestinal ("GI") Impairments

On July 12, 2006, two months after the surgery on Yu's lumbar spine, Yu went to the emergency room with tenderness in her lower right abdomen.  (R. 160.)   Weill Cornell physicians conducted a CT scan, which revealed that Yu had (i) appendicitis with a ruptured appendix, [26] as well as an abscess of air and fluid adjacent to it, and (ii) a lesion, likely a cyst, on the right lobe of the liver.  (*Id.*)   The next day, the physicians proceeded to drain the abscess adjacent to Yu's appendix using a needle.  (R. 161.)   After this procedure, Yu's appendicitis became asymptomatic, in that Yu no longer had any pain.  (R. 165.)  Accordingly, the physicians told Yu that they would wait prior to pursuing any additional action.  (*Id.*)

On August 18, 2006, Yu sought a second opinion from surgeon, Dr. Michael Lieberman, who confirmed that she had appendicitis with a ruptured appendix.  (R. 165-66; *see* R. 174.)  Dr. Lieberman ordered a second CT scan, and recommended an appendectomy.[27]   (R. 166.)  This scan showed several spots "of indeterminate etiology" on the right lobe of Yu's liver, but also showed that the abscess adjacent to her appendix was gone.  (R. 168.)

On October 19, 2006, Dr. Lieberman performed the appendectomy laparoscopically, with tubes inserted in the abdomen through small incisions,[28]  and discovered that Yu's appendix was "truncated from probable prior rupture."  (R. 170; *see* R. 174.)  Dr. Lieberman also reported that Yu "tolerated . . . well" the appendectomy, which occurred without any complications.  (R. 172.)

---

[26]     Appendicitis is swelling of the appendix, which can cause the appendix to rupture. Rupturing may then result in the formation of an abscess.  PubMed Health, *Appendicitis* (2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001302.

[27]     Appendectomies are the surgical removal of the appendix.  PubMed Health, *Appendectomy* (2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0003418.

[28]     PubMed Health, *Laparoscopic Surgery—Series* (2009), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004824.

After the appendectomy, Dr. Lieberman saw Yu again for follow-ups on October 30, 2006 and January 29, 2007. (R. 174.) During Yu's final visit, Dr. Lieberman advised that Yu see an "internist" about the untraceable pain in her side and chest. (*Id.*)

In July or August 2007, Yu started seeing Dr. James Lax, a gastroenterologist, regarding her "persistent GI problems," including those stemming from the appendectomy. (R. 149, 176.) On September 14, 2007, based on an endoscopy, Dr. Lax newly diagnosed Yu with esophagitis with Barrett's metaplasia,[29] which, according to Dr. Lax, "require[d] regular followup treatment." (R. 176.) Dr. Lax saw Yu a total of ten times, the last time being March 3, 2009. (R. 149.)

On February 13, 2010, Dr. Lax stated, in a letter, that Yu's hepatitis B, liver issues, and GI problems "for which I have seen her in the past" had not contributed to her disability. (R. 396.) Rather, in Dr. Lax's opinion, Yu's disability was "more related to her diabetes, hypertension, herniated disks, and . . . related to a complicated ruptured appendix and ensuing surgery, *before she became my patient*." (*Id.* (emphasis added).)

On February 26, 2011, in response to questions regarding Yu's "ability to do work-related activities," Dr. Lax represented that he was unable to answer any of the questions, among

---

[29]     Esophagitis is swelling of the esophagus often caused by gastroesophageal reflux disease (GERD), a condition where stomach acid rises back up to the esophagus. Over time, esophagitis due to GERD may result in Barrett's esophagus, a form of "metaplasia" or abnormal tissue transformation, where the lining of the esophagus deteriorates and eventually resembles that of the stomach. Failure to treat esophagitis can lead to "severe discomfort" and "scarring (stricture)" in the esophagus. PubMed Health, *Esophagitis* (2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002138; PubMed Health, *Barrett's Esophagus* (2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002128; PubMed Health, *Gastroesophageal Reflux Disease* (2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001311; Stedman's Medical Dictionary 250430 (27th ed. 2000).

which were questions about the length of time for which Yu could stand or sit and the amount of weight that Yu could lift or carry. (R. 404-407.)

iv. Mental Impairments

On May 7, 2011, a psychologist, Dr. Ronald Sherman, saw Yu for the first *and only* time. (R. 416.) As Dr. Sherman noted, Yu explained that she had previously never visited any psychiatrists, because "Chinese never visit . . . psychiatrist[s]." (R. 424 (quotations omitted).) Dr. Sherman found that Yu exhibited the following symptoms, evidence of which existed as early as November 25, 2008[30]:

> [D]epression, tearfulness, anxiety, persistent irrational fears, change in personality, mood disturbance, emotional lability, diminished frustration tolerance, hostility/irritability/agitation, sleep disturbance, psychomotor retardation, anhedonia, feelings of guilt/worthlessness, decreased energy, social withdrawal/isolation, poor self-esteem, difficulty thinking/concentrating, . . . paranoia, perseverative thinking and suicidal ideation[.]

(R. 424; *see* R. 417-18 (additionally naming "[r]ecurrent panic attacks" and "[o]bsessions or compulsions" as symptoms).)

In light of these findings, Dr. Sherman clinically diagnosed Yu with generalized anxiety disorder,[31] major depressive disorder,[32] and hypochondriasis.[33] (R. 416, 426.) Dr. Sherman also

---

[30] The significance of November 25, 2008 is unclear, except that it happens to be the same date that Yu consulted with Dr. Berman. *Supra.*

[31] Generalized anxiety disorder is characterized by anxiety about an array of events or activities, which is disproportionate and difficult to control. This condition can be accompanied by symptoms such as fatigue, difficulty concentrating, and restlessness, and usually results in moderate to serious disability. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 222-26 (5th ed. 2013).

[32] Major depressive disorder results in a negative mood and loss of interest or pleasure, accompanied by symptoms such as decreased energy, difficulty concentrating, feelings of guilt/worthlessness, and even suicidal ideation. The consequences of this condition range from mild to "complete incapacity." *Id.* at 160-68.

assessed Yu's Global Assessment of Functioning ("GAF") score as *at least* 42 for the past year, though her present score was 46.[34]  (*Id.*)  Dr. Sherman therefore concluded that Yu was "totally disabled emotionally and unable to function in any job in any capacity" since November 25, 2008.[35]  (R. 423, 426.)

### 2.  Yu's Statements

On July 2, 2009, in a disability report, Yu stated that, even though her last employer terminated her before she became disabled, Yu's set of impairments—including glaucoma, spinal issues, GI problems, diabetes, hepatitis B, and hypertension—had prevented her from further employment.  (R. 134-35, 143.)  Yu claimed that these impairments caused her "constant fatigue and pain all the time," such that she could no longer stand or sit for long periods of time.  (R. 135.)

On May 12, 2011, at the hearing before the ALJ, Yu similarly testified that "chronic health problems[,] stemming initially from the back injury" in February 2004, kept her from working again.  (R. 34.)  Yu denied her ability to resume her past work as an in-house attorney, as she could not "sustain the periods of time that I need to do documents," let alone handle the

---

[33]  Hypochondriasis is a condition where one has an unwarranted fear or belief that all symptoms are signs of serious diseases, despite contrary medical diagnoses.  This condition causes "clinically significant" impairment.  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 462-65 (4th ed. 1994).

[34]  GAF scores are assessments of individuals' "overall level of functioning," *i.e.*, psychological, social, and occupational functioning.  Scores in the range of 41 to 50 reflect "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, *unable to keep a job*)."  *Id.* at 30-32 (emphasis added).

[35]  Supplementing his conclusion of total disability, Dr. Sherman also indicated that, due to Yu's conditions and their symptoms, Yu was, *inter alia*, effectively unable to follow detailed instructions, stick to a schedule, maintain a routine, work with others, respond to changes at the workplace, and go through a work week without interruptions; and significantly limited in her abilities to understand and remember detailed instructions, concentrate, and interact appropriately in public.  (R. 418-21.)

"mere physical strain" of going to work for eight hours at a desk.  (R. 43, 46.)  Yu admitted that, in spite of her inability to work, she was able to care for her daughter, volunteer at her daughter's school, perform chores around the house, and do light shopping for groceries across the street. (R. 47.)  Yu also admitted that she could casually walk up to five blocks.  (R. 47-48.)

In terms of impairments, Yu cited the cataracts and glaucoma in her eyes, and testified that she had trouble seeing the computer screen.  (R. 43.)  Yu further testified that (i) before the surgery on her lumbar spine in May 2006, she had weakness in her left leg, which forced her to walk with a baby stroller, and sharp pain in her buttocks and down her leg, and that (ii) after the surgery, she continued to suffer increased cramping from her legs down to her feet and stenosis in her cervical spine.  (R. 40-42.)  Yu also testified that she took a "very long time" to recover from the appendectomy in October 2006; and that esophagitis still caused "very painful" burning sensations and discomfort, because her stomach was continually pushing acid up into her mouth, and was likely the source of sharp spasms on the side of her body.  (R. 34-36, 40-41.)  Finally, Yu testified that hepatitis B left her feeling very tired.  (R. 37.)

## B.  Procedural History

On July 2, 2009, Yu applied for Social Security disability insurance benefits. (Compl. ¶ 6; R. 13, 119.)  The Social Security Administration ("SSA") denied Yu's application. (Compl. ¶ 7; R. 13, 53-56.)  Yu then requested a hearing before the ALJ, which took place on May 12, 2011.  (Compl. ¶¶ 7-8; R. 13, 61-62.)

On June 14, 2011, the ALJ also denied Yu's application.  (R. 21.)  In his decision, the ALJ found, *inter alia*, that:

- Yu had not engaged in "substantial gainful activity" from February 2004, when Yu's disability started, to December 2008, when Yu last satisfied the insured status requirement (R. 15);

- Throughout this time, Yu suffered from several "severe impairments"—(i) glaucoma, (ii) problems with the discs in her lumbar and cervical spine, (iii) esophagitis, (iv) conditions after surgery for the cataract in her right eye, the laminotomy on her lumbar spine, and the appendectomy, and (v) diabetes, hepatitis B, and hypertension (*id.*);

- Yu did not suffer from any "medically determinable psychological impairment," severe or otherwise, before December 2008, despite Dr. Sherman having diagnosed her with several based on an examination after December 2008 (R. 15-16);

- Yu's severe impairments were not among the ones "listed" by the SSA (R. 16);

- Regardless of the symptoms relating to her severe impairments, Yu had the "residual functional capacity to perform the full range of light work" and thus resume her past work as an attorney (R. 16-20); and

- The record did not refute the ALJ's "residual functional capacity" assessment, because (i) Yu's statements about the scope of her symptoms were not credible "to the extent they [were] inconsistent with the above residual functional capacity assessment" and (ii) Dr. Casden's opinions in the undated questionnaire were not entitled to "significant weight," in that they contradicted his September 2, 2008 letter and other evidence suggesting that Yu was able to work after August 2007 (R. 19-20).

Based on these findings, the ALJ concluded that Yu was not disabled for the relevant period covered by her application under the Social Security Act. (R. 20-21.)

On July 15, 2011, in a letter to the Appeals Council for the SSA's Office of Disability Adjudication and Review (the "Council"), Yu requested review of the ALJ's decision. (R. 7.) On January 5, 2012, the Council refused to conduct such a review. (R. 1-3.)

Accordingly, on February 17, 2012, Yu commenced this action. (Compl., at 1.)

II.  Discussion

A.  *Standard of Review*

This Court may reverse the Commissioner's final decision, issued by the ALJ, if this decision was (i) supported by "legal error" or (ii) *not* supported factually by "substantial evidence." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quotations omitted). In other words, the ALJ should have applied the "correct legal standards" and relied on "relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotations omitted); *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quotations omitted).

Whereas the "substantial evidence" standard of review for the ALJ's factual findings is deferential, the standard of review for his legal conclusions is not. "Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). Thus, even if this Court can defer to the ALJ's factual findings, it cannot permit legal errors in the decision below.

### B. *"Correct Legal Standards" Applicable to the Administrative Decision*

Yu's "disability" must have (i) started no later than the date she last satisfied the insured status requirement and (ii) ended no sooner than one year from the date she applied for Social Security disability insurance benefits. 42 U.S.C § 416(i)(2)(C), (E); *see* 20 C.F.R. § 404.315(a). As Yu had maintained insured status until December 2008 and applied for benefits in July 2009, the ALJ appropriately considered whether Yu's period of disability began before December 2008 and lasted until at least July 2008. (R. 18.) Periods of disability starting in May 2011 or ending in August 2007, for instance, would have been irrelevant.

In making his factual findings regarding Yu's "disability,"[36] the ALJ had a duty to develop the record through non-adversarial hearings, *Shaw*, 221 F.3d at 131, and then to conduct

---

[36]     Section 223(d) of the Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

a five-step analysis. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). The second step in this analysis was to determine if Yu had any "severe impairment." The fourth step was to determine if, despite Yu's severe impairments, Yu demonstrated the "residual functional capacity" to resume her past work. *Id.* (citing 20 C.F.R. §§ 404.1520, 416.920). After undertaking the first four steps in this analysis, the ALJ decided that Yu had the "residual functional capacity" to resume her past work as an attorney. (R. 20.)

### 1. "Special Technique" for Mental Impairments

At the second step in the five-step analysis, with respect to Yu's mental impairments, the ALJ should have also applied a "special technique" in assessing whether such impairments were severe: first finding if Yu had "medically determinable" impairments, then finding her "degree of functional limitation" stemming from these impairments. *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (Sotomayor, J.) (quoting 20 C.F.R. § 404.1520a).

In his decision, the ALJ merely cited the fact that Yu's "medically determinable" mental impairments were diagnosed by Dr. Sherman in May 2011, "well after" December 2008, and concluded that therefore such impairments did not exist during the relevant period. (R. 15-16; *see* Dkt. No. 13 ("Def. Br."), at 17-19.) The ALJ erred in his conclusion. (*See* Pl. Br., at 17-20.)

Despite not having *examined* Yu during the relevant period, Dr. Sherman determined that she had developed generalized anxiety disorder, major depressive disorder, and hypochondriasis, rendering her "totally disabled," as early as November 2008. The date of Dr. Sherman's examination should not have been the dispositive reason for rejecting this diagnosis. Rather than

---

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The combination of impairments must be severe enough that the claimant is neither able to resume her past work, nor able to do "any other kind of substantial gainful work which exists in the national economy," considering her age, education, and work experience. *Id.* at 423(d)(2)(A).

rejecting Dr. Sherman's "retrospective diagnosis," the ALJ should have assessed the basis for this diagnosis by developing the record. *See Rogers v. Astrue*, 895 F. Supp. 2d 541, 550-52 (S.D.N.Y. 2012) (collecting cases).

In *Rogers*, the court held that the ALJ should have "attempt[ed] to fill the gaps in the administrative record," rather than stressing the absence of "mental health treatment records" from the relevant period and refusing to consider the psychiatrist's "retrospective diagnosis" for the plaintiff's post-traumatic stress disorder. *Id.* "[I]t was legal error for the ALJ to rely on Plaintiff's lack of evidence from the relevant time period to deny benefits without first attempting to adequately develop the record, or to 'pursue or consider the possibility of retrospective diagnosis.'" *Id.* at 552 (quoting *Martinez v. Massanari*, 242 F. Supp. 2d 372, 378 (S.D.N.Y. 2003)); *accord Agnese v. Chater*, 934 F. Supp. 59, 62-63 (E.D.N.Y. 1996) (Wexler, J.) (finding that the ALJ incorrectly ignored that the psychiatrist had diagnosed the plaintiff with panic disorder "dating back to 1972," where no additional evidence had been adduced to contradict this diagnosis).

Had the ALJ fulfilled his duty to develop the record in this action, he might have found that Dr. Sherman's "retrospective diagnosis" was accurate and that Yu had been suffering from mental impairments all along, but avoided seeking treatment for cultural or other reasons. Accordingly, this Court remands this action, instructing the ALJ to reassess Yu's mental impairments after developing the record.

2. Treating Physician Rule

Throughout the five-step analysis, the ALJ was obligated to give "controlling weight" to opinions from treating physicians regarding Yu's impairments, except if these opinions were (i) inconsistent with "other substantial evidence" in the record or (ii) not supported by

"medically acceptable clinical and laboratory diagnostic techniques." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting 20 C.F.R. § 404.1527).

If the ALJ did not give these opinions "controlling weight," he needed to consider the following four factors:

> (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.

*Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Upon consideration of these factors, the ALJ had to specify the weight that he would give to these opinions and provide "good reasons" for giving them such weight. *Id.* (quotations omitted). *See also Shaw*, 221 F.3d at 134 (same).

At step four in the five-step analysis, during the assessment of Yu's "residual functional capacity" to resume her past work, the ALJ decided not to give "controlling weight" to Dr. Casden's opinions in the undated questionnaire. (R. 19.) These opinions could have otherwise supported the conclusion that Yu continued to lack such capacity and was still disabled as of September 2008, which was within the relevant period, rather than the ALJ's actual conclusion that Yu regained such capacity and was no longer disabled after August 2007. (*See* Pl. Br., at 13.) According to the ALJ, these opinions were (i) inconsistent with Dr. Casden's earlier letter, which stated that Yu had been "unable to work from approximately June 2005 to August 2007," and his treatment notes; (ii) inconsistent with the remaining medical evidence in the record; and (iii) without "medical basis." (R. 19-20; *see* Def. Br., at 12-14.) None of the above were valid reasons for the ALJ's ruling rejecting Dr. Casden's opinions in the undated questionnaire. (*See* Pl. Br., at 12-16.)

First, Dr. Casden's earlier letter and treatment notes were not substantially inconsistent with his opinions in the undated questionnaire. The letter simply suggested that, because of the

surgery on Yu's lumbar spine, Yu had been unable to work between June 2005 and August 2007; it did not imply that she was *able* to work after August 2007. As reflected in the treatment notes, Yu recovered after the surgery, but also developed significant pain in her cervical spine and eventually pain "all over."[37] In short, although the issues with Yu's lumbar spine improved after the surgery, additional issues with her cervical spine and other areas subsequently arose.

Even if Dr. Casden's earlier letter and treatment notes were inconsistent with his opinions in the undated questionnaire, the ALJ should not have selectively relied on the former, insofar as they supported his conclusion and the latter did not. *See Shaw*, 221 F.3d at 135 (holding that the district court's reliance on and rejection of inconsistent opinions from the same doctor were "inconsistent use[s]" that "undermine[d] any argument that [this doctor's] opinion was so unreliable that it should not have been assigned controlling weight"). Rather, the ALJ had a duty to develop the record to resolve any conflict in the respective opinions from Dr. Casden. *See Rosa v. Callahan*, 168 F.3d 72, 76, 79-80 (2d Cir. 1999) (Sotomayor, J.) (holding that the ALJ should have supplemented the record, instead of rejecting the treating physician's opinion as inconsistent with his "sparse notes," offering "incomplete information that was necessarily conclusive of very little" (quotations omitted)); *Clark*, 143 F.3d at 117-18 (holding that the doctor could have explained the "perceived inconsistencies between [his] two reports," had the ALJ developed the record rather than discrediting one of the reports); *see also Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) (Gleeson, J.) ("[I]f an ALJ perceives inconsistencies in

---

[37] The fact that Dr. Casden ultimately "provided only a referral to a rheumatologist" to treat this pain after the surgery (Def. Br., at 13; *see* R.19) did not undermine his opinions in the undated questionnaire that Yu was still disabled as of September 2008. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Nor is the opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen."); *see also Shaw*, 221 F.3d at 134 (same).

a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").

Second, the remaining medical evidence in the record was not substantially inconsistent with Dr. Casden's opinions in the undated questionnaire.[38] Contrary to the ALJ's conclusion (R. 19-20; *see* Def. Br., at 13-14), the reports and treatment notes by Dr. Santini, Dr. Berman, and Dr. Lax from late 2008 to 2010 were mostly consistent with Dr. Casden's opinions. Neither Dr. Berman nor Dr. Santini, during their examinations of Yu in November 2008 and February 2009, respectively, ever discredited the pain in and around Yu's spine. In fact, Dr. Berman found that Yu demonstrated tenderness in her cervical spine, with pain resulting from extension and side-to-side movement, and diagnosed her with degenerative joint disease. Moreover, Dr. Lax, in February 2010, attributed Yu's disability more to the "herniated disks" in her spine, and did not assess whether Yu was able to stand or sit for a long time and lift or carry certain weights.

Additionally, the ALJ cited the other physicians' opinions, without even specifying how they contradicted Dr. Casden's opinions. (R. 19-20.) The ALJ's conclusory statement—that the other physicians' opinions "did not indicate significant problems associated with the claimant's musculoskeletal system" (R. 19)—failed to substantiate his reliance on the other physicians' opinions and rejection of Dr. Casden's opinions on inconsistency grounds. *See Smollins v. Astrue*, No. 11-cv-424, 2011 WL 3857123, at *10 (E.D.N.Y. Sept. 1, 2011) (Gleeson, J.) ("[The

---

[38]    To the extent that the ALJ also cited notes from Yu's physical therapy sessions in 2009 (R. 19; *see* Def. Br., at 14), including a note from her final session indicating improvement and less pain, these notes were not physicians' notes, and thus, they did not provide the substantial basis for rejecting Dr. Casden's opinions. *See Green-Younger*, 335 F.3d at 107 (refusing to consider an evaluation by a physical therapist as "substantial evidence" inconsistent with the treating physician's opinion).

ALJ's] perfunctory explanation for his reliance on such opinions and his rejection of the treating physicians' evaluations cannot withstand judicial scrutiny. For this reason alone, I would remand."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 630 (S.D.N.Y. 2006) (holding that, because "it is unclear how the clinical notes [by other physicians] contradict [the treating physician's] view," the ALJ's determination of inconsistency was "too vague and conclusory").

On appeal, for the first time, the Commissioner seeks to explain the inconsistency between Dr. Casden's opinions and the other physicians' opinions, by specifying that both Dr. Santini and Dr. Berman determined, *inter alia*, that Yu exhibited normal ranges of motion. (Def. Br., at 13-14.) Such determinations were not, however, necessarily inconsistent with Dr. Casden's opinions in support of Yu's disability. The pain that rendered Yu disabled might have persisted, even though she was able to move about normally. Dr. Berman herself concluded that extension and side-to-side movement caused pain in Yu's cervical spine. In *Zubizarreta v. Astrue*, No. 08-cv-2723, 2010 WL 2539684 (E.D.N.Y. June 16, 2010) (Dearie, C.J.), the court found that another physician's assessment that the plaintiff possessed a "full range of motion" was not "substantial evidence" of inconsistency entitling the treating physician's opinions to less-than-controlling weight. *Id.* at *6; *accord Dousewicz v. Harris*, 646 F.2d 771, 775 (2d Cir. 1981) (finding that the fact that the plaintiff "retained full range of motion" "fail[ed] to bear on the question of whether the plaintiff's chronic pain was disabling"). The Commissioner's belated explanation therefore is not convincing.

Finally, Dr. Casden's opinions in the undated questionnaire had a "medical basis." "Medically acceptable clinical and laboratory diagnostic techniques" included "physical examinations and diagnostic procedures" and the consideration of Yu's "complaints, or [medical] history." *Green-Younger*, 335 F.3d at 107. Prior to completing the undated

questionnaire, in which he opined on Yu's disability, Dr. Casden not only physically examined Yu and considered her complaints of continuing pain after the surgery, but also took an MRI which revealed certain issues with her cervical spine, such as foraminal stenosis. In *Green-Younger*, the Second Circuit held that the treating physician's opinion, regarding the plaintiff's disability due to fibromyalgia, was substantiated by even fewer "techniques": "tender points" examinations and "subjective complaints" from the plaintiff, but nothing that yielded "objective evidence to quantify the severity of the [plaintiff's] pain." *Id.* at 104, 106-108. In other words, Dr. Casden's opinions had as much "medical basis" as the treating physician's opinion in *Green-Younger*.

Even if the ALJ, in referring to "additional medical findings" (R. 19), meant to indicate that Dr. Casden's opinions required more *objective* evidence, the ALJ should have attempted to acquire such evidence by developing the record. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings [in support of the treating physician's opinion] were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Clark*, 143 F.3d at 118 (concluding that the treating physician could have offered clinical findings in support of his report, which stated that "[the plaintiff] could not sit for most of the workday," and that "[the treating physician's] failure to include this type of support for the findings in his report does not mean that such support does not exist").

Accordingly, this Court remands this action, instructing the ALJ to develop the record, determine whether Dr. Casden's opinions deserve controlling weight, and, if applicable, articulate reasons for according less-than-controlling weight to these opinions.

### 3. Credibility Analysis for Plaintiff's Statements

In assessing "residual functional capacity," the ALJ was also required to account for Yu's "reports of pain and other limitations," after analyzing the credibility of her statements through a "two-step process": (i) first, considering if Yu's impairments could "reasonably be expected to produce the symptoms" to which she had testified; and (ii) second, evaluating the extent to which these symptoms were "consistent" with the rest of the record. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citing 20 C.F.R. § 404.1529).

The ALJ concluded that Yu's statements concerning the scope of her symptoms were not credible, as these statements failed to satisfy step two of this test "to the extent they [were] inconsistent with the above residual functional capacity assessment." (R. 17.) The ALJ's conclusion incorrectly assumed that any of Yu's statements that contradicted his "residual functional capacity" assessment lacked credibility. (*See* Pl. Br., at 21-22.) The ALJ was supposed to account for Yu's statements, after considering their credibility based in part on consistency with the rest of the record, and then assess "residual functional capacity." By putting the proverbial cart before the horse, the ALJ violated the "dictates of the Social Security regulations." *Smollins*, 2011 WL 3857123, at *11 (denouncing "acceptance as a foregone conclusion" of residual functional capacity in the ALJ's analysis of the plaintiff's credibility); *see also Otero v. Colvin*, No. 12-cv-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) (Gleeson, J.) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's

subjective complaints are unworthy of belief.").[39] Indeed, the medical evidence in the record seems to strongly corroborate Yu's description of her symptoms and their scope.

Accordingly, this Court remands this action, instructing the ALJ to re-analyze the credibility of Yu's statements before assessing whether she had the "residual functional capacity" to resume her past work.

III.    Conclusion

For the foregoing reasons, this Court GRANTS Yu's motion and DENIES the Commissioner's cross-motion. The Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with this Court's decision.

SO ORDERED:


_/s/ Pamela K. Chen_____
PAMELA K. CHEN
United States District Judge


Dated: August 8, 2013
        Brooklyn, New York

---

[39]     Other courts in this District have remanded, where an ALJ has employed the same language ("to the extent they are inconsistent") to analyze whether a plaintiff's statements are credible. *See, e.g.*, *Romanelli v. Astrue*, No. 11-cv-4908, 2013 WL 1232341, at *11 (E.D.N.Y. Mar. 26, 2013); *Otero*, 2013 WL 1148769, at *7; *Pereyra v. Astrue*, No. 10-cv-5873, 2012 WL 3746200, at *15 (E.D.N.Y. Aug. 28, 2012); *Smollins*, 2011 WL 3857123, at *10.